SH

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Ivaughn Oakry, et al.,

Plaintiffs,

v.

Tempe, City of, et al.,

Defendants.

No.   CV 20-01167-PHX-JAT (DMF)

**ORDER**

Plaintiff Ivaughn Oakry, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and state law.   Defendants move for summary judgment (Doc. 71), and Plaintiff opposes the motion (Doc. 94).

**I.    Background**

In his Second Amended Complaint, Plaintiff sues the City of Tempe and Tempe Police Department (TPD) Officers Ronald Kerzaya, David Hanson, and Amy Pfeifer for allegations stemming from Plaintiff's June 15, 2019 arrest.  (Doc. 45.)

In Count One, Plaintiff alleges a Fourth Amendment unlawful entry claim against Defendant Kerzaya.  (*Id.* ¶¶ 38–49.)  In Count Two, Plaintiff alleges Fourth Amendment excessive force claims against Defendants Kerzaya, Hanson, and Pfeiffer.  (*Id.* ¶¶ 50–63.) In Count Three, Plaintiff alleges a municipal liability claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) against the City of Tempe ("the City") based on its alleged ratification of the Defendant officers' conduct.  (*Id.* ¶¶ 64–83.)  In Count Four, Plaintiff alleges a state law assault and battery claim against Defendants Kerzaya, Hanson, Pfeifer,

1    and the City.  (*Id.* ¶¶ 84–90.)  In Count Five, Plaintiff alleges a state law claim for

2    intentional infliction of emotion distress (IIED) against Defendants Kerzaya, Hanson,

3    Pfeifer, and the City.  (*Id.* ¶¶ 91–100.)  In Count Six, Plaintiff alleges a state law gross

4    negligence claim against Defendants Kerzaya, Hanson, Pfeifer, and the City.  (*Id.* ¶¶ 101–

5    105.)

6         Defendants now move for summary judgment as to all claims.  (Doc. 71.)

7    **II.    Summary Judgment Standard**

8         A court must grant summary judgment "if the movant shows that there is no genuine

9    dispute as to any material fact and the movant is entitled to judgment as a matter of law."

10   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

11   movant bears the initial responsibility of presenting the basis for its motion and identifying

12   those portions of the record, together with affidavits, if any, that it believes demonstrate

13   the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

14        If the movant fails to carry its initial burden of production, the nonmovant need not

15   produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

16   1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

17   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

18   contention is material, i.e., a fact that might affect the outcome of the suit under the

19   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

20   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

21   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

22   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

23   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

24   it must "come forward with specific facts showing that there is a genuine issue for trial."

25   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

26   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

27        At summary judgment, the judge's function is not to weigh the evidence and

28   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

## III.   Undisputed Facts[1]

On June 15, 2019, TPD communications issued a dispatch of a female caller, later identified as Mekayla Brand, reporting a "male vs. female" physical altercation and advised that the suspect had been drinking, there were no drugs or weapons, there were three children in the apartment, a child could be heard crying in the background, and the caller was shouting, "Stop pushing me!"  (Doc. 72 (Defs.' Statement of Facts) ¶ 6); Doc. 87 (Pl.'s Controverting Statement of Facts (PCSOF)) at 3, n.5; Doc. 87 (Pl.'s Statement of Facts (PSOF) ¶¶ 2, 4, 6.)  Defendant Kerzaya was dispatched to respond to Ms. Brand's call at approximately 5:50 a.m.  (Doc. 72 ¶ 8.)  Defendant Kerzaya arrived at the apartment complex at approximately 5:53 a.m.  (*Id.* ¶ 9.)  Defendant Kerzaya knocked on Plaintiff's apartment door at 5:55 a.m., and a child could be heard screaming inside the apartment.  (*Id.* ¶ 13.)

Plaintiff opened the door and stood in the doorway.  (*Id.* ¶ 14.)  Defendant Kerzaya asked Plaintiff, "Hey what's happening man?" and Plaintiff replied, "Nothing."  (*Id.* ¶ 15.)  Defendant responded, "Okay. That's not what I'm being told, so . . . ." and Plaintiff replied, "It's my house."  (*Id.*)  Defendant Kerzaya told Plaintiff, "I don't care if it's your house or not, put your hands behind your back.  Come here." (Doc. 87 (PSOF) ¶ 9.)  Plaintiff backed into the apartment, leaving the door open. (Doc. 72 ¶ 17.)  Plaintiff's three children were inside the apartment watching cartoons. (Doc. 87 (PSOF) ¶ 13.)  Plaintiff told Defendant Kerzaya that Defendant Kerzaya "was not allowed in here" without Plaintiff's permission. (*Id.* ¶ 12.)  Defendant Kerzaya followed Plaintiff inside the apartment and ordered Plaintiff

---

[1] Defendants have provided the body camera footage from Plaintiff's arrest.  (*See* DVD, Exs. 5, 6, 7, 11, 12, 13, 14.)  To the extent either party's facts conflict with the video footage, the Court will consider the evidence as depicted by the body camera footage.  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape").

to "put [his] fucking hands behind [his] back!"; Plaintiff raised his hands but did not put them behind his back.  (Doc. 72 ¶ 18; Doc. 87 (PCSOF) ¶ 18; Doc. 87 (PSOF) ¶ 14.) Defendant Kerzaya drew his taser and aimed it at Plaintiff; Plaintiff stated, "Bro, if you TASE me. . ." (Doc. 72 ¶ 19.)  Plaintiff's children began crying.  (Doc. 87 (PSOF) ¶ 16.)

Over the next 20 seconds, Defendant Kerzaya ordered Plaintiff to place his hands behind his back three times and ordered him to place his hands on top of his head three times; Defendant Kerzaya warned Plaintiff that he would be tased if he did not comply. (Doc. 72 ¶ 21.)  Plaintiff did not place his hands behind his back, and told Defendant Kerzaya, "Wait!  Wait!  Wait!" (*Id.*; Doc. 87 (PSOF) ¶ 20.)  Defendant Kerzaya arced his taser at Plaintiff, and over the next 15 seconds, Defendant Kerzaya again ordered Plaintiff to place his hands on top of his head.  (Doc. 72 ¶¶ 23, 24.)[2]  Plaintiff's toddler son ran over to Plaintiff, and Plaintiff picked him up; over the next 17 seconds, Defendant Kerzaya ordered Plaintiff f to put the toddler down twice and to place his hands on top of his head three times.  (*Id.* ¶¶ 24, 25; Doc. 87 (PSOF) ¶ 24.)

Around this time, Officers Vick and Fernandez, who are not parties in this action, arrived on the scene.  (Doc. 72 ¶¶ 26, 27.)  Officer Vick approached Plaintiff and put her hand on Plaintiff's arm, but Plaintiff pulled his arm away and said, "Please [d]on't." (*Id.* ¶ 29; Doc. 87 (PSOF) ¶ 28.)  Over the next 2 minutes and 25 seconds, Defendant Kerzaya warned Plaintiff that he would be tased if he did not follow the officers' commands; during that same time frame Defendant Kerzaya and Officer Fernandez ordered Plaintiff to put his toddler down and hand the toddler to Officer Fernandez 24 times.  (Doc. 72 ¶ 30.)  Plaintiff responded, "there's no other adult in here, man."  (Doc. 87 (PSOF) ¶ 29.)

Plaintiff did not put the toddler down, and stated, "No!  Fucking get him [pointing to Defendant Kerzaya]!  I am not fucking putting him down!"  (Doc. 72 ¶ 31.)  Plaintiff also stated, "Hey!  I will go toe to toe with you.  Fuck it.  Look, you tase me I am going to

---

[2] A "warning arc" issues an audible warning over the front of the taser cartridges without deploying the cartridges.   *See*  https://my.axon.com/s/article/Warning-Arc-Display?language=en_US#:~:text=With%20a%20Warning%20Arc%20display,TASER%207%20CEW%20is%20loaded (last visited Sept. 12, 2022).

jam that shit and we're gonna go!"; "I'm not handing shit"; and, "No, fuck that, I'm not putting him down," after nearly placing the toddler down and then picking him up again. (*Id.*)  During this exchange, Officer Vick took the other two children from the living room and out onto the apartment balcony, and then she came back into the apartment.  (*Id.* ¶ 32.)  Plaintiff backed into the corner of the apartment next to the door of the balcony; he was still holding the toddler.  (*Id.* ¶ 33.)

Around this time, Ms. Brand reentered the apartment and began saying, "Nothing happened.  Nothing happened."  (Doc. 87 (PSOF) ¶ 36.)  Defendant Kerzaya told Ms. Brand, "That's not how this works.  You called us out here.  Things have changed.  You need to get out of the apartment now.  Get out of the apartment right now!  Get out of the apartment.  Please."  (*Id.* ¶ 37.)  Plaintiff took out his cell phone and began recording the altercation while still holding the toddler.  (*Id.* ¶ 40.)  Plaintiff demanded that Defendant Kerzaya leave the apartment but indicated that the "ladies are good" referring to female Officers Vick and Fernandez.  (*Id.* ¶ 41.)

Defendant Hanson arrived at the apartment at approximately 5:59 a.m., and Defendant Pfeiffer arrived a few seconds later.  (Doc. 72 ¶ 34.)  Defendant Hanson aimed his taser at Plaintiff and announced he was, "going low."  (*Id.* ¶ 35.)  As the officers began closing in on him, Plaintiff started backing into the corner by a pile of garbage bags and unpacked cardboard moving boxes, close to the apartment balcony door.  (*Id.* ¶ 36; Doc. 87 (PCSOF) ¶ 36; Doc. 87 (PSOF) ¶¶ 44–48.)  The officers continued to order Plaintiff to either put the toddler down or hand the toddler to Defendant Pfeiffer.  (Doc. 72 ¶ 37.)  Plaintiff did not put the toddler down or hand him to one of the officers.  (*Id.*)  Officer Vick tried to place her hands on Plaintiff, and Plaintiff shook Officer Vick off, yelling "Don't touch me!"  (*Id.* ¶ 38.)  Plaintiff further backed into the corner, screaming: "Stop touching me!  Stop touching me!"  (*Id.* ¶ 39.)  Around this time, Defendant Hanson stated, "Do it, do it," and Defendants Kerzaya and Hanson and Officer Vick simultaneously deployed their tasers at Plaintiff in probe mode—also known as "dart mode"—for 5-second intervals.  (*Id.* ¶¶ 40, 41; Doc. 87 (PSOF) ¶¶ 58, 59.)  Defendant Pfeiffer did not deploy her taser or

use any force on Plaintiff.  (Doc. 72 ¶ 43.)  Each of the six darts pierced Plaintiff's skin and delivered an electrical current that caused extreme pain, locked up his muscles, and immobilized; the probes connected with Plaintiff only.  (*Id.* ¶ 44; Doc. 87 (PSOF) ¶ 60.) Plaintiff fell into a pile of cardboard moving boxes and trash bags filled with clothes.  (Doc. 72 ¶ 46.)  Plaintiff fell on his right shoulder and released the toddler, who also fell on the pile of bags and boxes.  (*Id.* ¶ 47.)  Defendant Hanson pulled Plaintiff off the trash bags, while Defendant Pfeifer and Officer Fernandez immediately scooped up the toddler and brought him to Ms. Brand, who was standing near the apartment front door inside the apartment.  (*Id.* ¶ 48; Doc. 87 (PCSOF) ¶ 48.)

Defendants Hanson and Kerzaya ordered Plaintiff to lay on his stomach.  (Doc. 72 ¶ 49.)  Plaintiff did not roll over onto his stomach, and told the officers to "wait" as they attempted to handcuff Plaintiff behind his back  (*Id.* ¶¶ 50, 51.)  Plaintiff asserts that he was physically unable to move after being tased three times.  (Doc. 87 (PSOF) ¶ 63.) Defendant Kerzaya deployed his second cartridge in probe mode, and Defendant Hanson simultaneously arced his taser through the existing probes three times in one-second intervals.  (Doc. 72 ¶ 52; Doc. 87 (PCSOF) ¶ 52.)  In total, Plaintiff was tased seven times in approximately 21 seconds.  (Doc. 87 (PSOF) ¶ 69.)  The officers then handcuffed Plaintiff behind his back.  (Doc.72 ¶ 54.)

Tempe Fire Department examined the toddler at the scene and did not find any injuries.  (*Id.* ¶ 55.)  Plaintiff was arrested for misdemeanor assault, but the charges were later dropped because Ms. Brand did not want to aid in furthering the prosecution .  (*Id.* ¶¶ 56, 57.)

On November 5, 2019, TPD Chief Moir held a press conference regarding Plaintiff's arrest.  (Doc. 72 ¶ 58.)  Chief Moir informed the press that no policy violation occurred during Plaintiff's arrest and that the officers involved would receive additional training.  (*Id.* ¶ 59.)  After Plaintiff's arrest, the officers involved participated in a debrief where they reviewed different taser techniques and ground techniques that could have been

1    used during the incident, including arms bars, elbow control holds, and drive stuns with

2    the taser.  (Doc. 87 (PSOF) ¶¶ 96, 97.)

3    **IV.    Unlawful Entry**

4         **A.    Legal Standard**

5         The Fourth Amendment guarantees "[t]he right of the people to be secure in their

6    persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S.

7    Const. amend. IV.  It is a basic principle that "searches and seizures inside a home without

8    a warrant are presumptively unreasonable.'"  *Brigham City v. Stuart*, 547 U.S. 398, 403

9    (2006) (quotation omitted); *Kirk v. Louisiana*, 536 U.S. 635, 637-639 (2002) (recognizing

10   that the Fourth Amendment prohibits warrantless entry into a home for the purposes of

11   making an arrest).

12        To justify a warrantless entry into a residence, the government must show the

13   existence of probable cause and exigent circumstances.  *Kirk*, 536 U.S. at 638.  "There are

14   two general exceptions to the warrant requirement for home searches: exigency and

15   emergency."  *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005).  But these

16   exceptions are applied narrowly, and a warrant is generally required to enter a person's

17   home "unless the exigencies of the situation make the needs of law enforcement so

18   compelling that the warrantless search is objectively reasonable under the Fourth

19   Amendment."  *Brigham City*, 547 U.S. at 403 (internal quotation omitted); *see Hopkins v.*

20   *Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009); *see also Payton v. New York*, 445 U.S. 573,

21   590 (1980) ("[t]he Fourth Amendment has drawn a firm line at the entrance to the house.

22   Absent exigent circumstances, that threshold may not reasonably be crossed without a

23   warrant").

24        **B.    Discussion**

25        Defendants argue that Defendant Kerzaya's warrantless entry into Plaintiff's

26   apartment was justified by exigent circumstances and that the law was not clearly

27   established that an officer in Defendant Kerzaya's position would have known that exigent

28   circumstances were lacking when entering Plaintiff's apartment.  (Doc. 71 at 4.)  In

response, Plaintiff contends that there were no exigences because Defendant Kerzaya knew that the victim, Ms. Brand, was not in the apartment before he entered, and once Defendant Kerzaya saw that the children were safe in the apartment, the exigency expired.  (Doc. 94 at 11–14.)

Even if Defendant Kerzaya knew that Ms. Brand was not in the apartment when he entered, it is undisputed that Defendant Kerzaya had been informed by dispatch that the children were still in the apartment with Plaintiff, who had, as far as Defendant Kerzaya knew at the time, just assaulted the children's mother.  Plaintiff's argument that Defendant Kerzaya's exigency argument fails due to not mentioning the crying child or his concern for the children's safety in his police report is not well-taken.  The undisputed video evidence shows that a child could clearly be heard crying inside Plaintiff's apartment as soon as Defendant Kerzaya knocked on the door.  Any reasonable officer, upon hearing a child crying inside an apartment with an individual suspected of assaulting the child's mother would believe that an emergency or exigency existed that would justify entering the apartment without a warrant.

Moreover, the exigency did not expire just because Defendant Kerzaya saw that the children appeared unharmed when he entered the apartment.  In *United States v. Brooks*, 367 F.3d 1128, 1135–37 (2004), the Ninth Circuit held that a police officer's warrantless entry into a suspect's hotel room was justified by the officer's objectively reasonable belief that a domestic assault was taking place and that a woman was in danger inside the room. Moreover, the Ninth Circuit found that it was proper for the officer to remain in the room, even after the woman stated she was unharmed, in order to ask further questions.  *Id.*

Similarly, on this record, where the undisputed facts show that Plaintiff was suspected of domestic assault, Plaintiff's children were still in the apartment, and one of the children was crying loud enough to be heard through the apartment door, it was objectively reasonable for Defendant Kerzaya to believe that the child might have been in danger, and this exigency justified his entry into the apartment without a warrant and to remain in the apartment to ask further questions of Plaintiff and the children, if necessary.

1   Accordingly, the unlawful entry claim will be dismissed, and Defendants' qualified

2   immunity argument need not be further addressed.

3   **V.     Excessive Force**

4       **A.     Legal Standard**

5   The use of excessive force by police officers in the course of an arrest can violate

6   the arrestee's Fourth Amendment right to be free from unreasonable seizures.  *See White*

7   *by White v. Pierce County*, 797 F.2d 812, 816 (9th Cir. 1986).  The Fourth Amendment

8   does not prohibit the use of reasonable force.  *Tatum v. City & County of S.F.*, 441 F.3d

9   1090, 1095 (9th Cir. 2006).  Whether the force was excessive depends on "whether the

10  officers' actions [were] 'objectively reasonable' in light of the facts and circumstances

11  confronting them, without regard to their underlying intent or motivation."  *Graham v.*

12  *Connor*, 490 U.S. 386, 397 (1989); *Tatum*, 441 F.3d at 1095; *Lolli v. County of Orange*,

13  351 F.3d 410, 415 (9th Cir. 2003).  The Court must balance the nature and quality of the

14  intrusion against the countervailing governmental interests at stake.  *Graham*, 490 U.S. at

15  396; *Lolli*, 351 F.3d at 415.  Moreover,

16         [t]he "reasonableness" of a particular use of force must be

17         judged from the perspective of a reasonable officer on the
       scene, rather than with the 20/20 vision of hindsight. . . . . "Not

18         every push or shove, even if it may later seem unnecessary in
       the peace of a judge's chambers," violates the Fourth

19         Amendment.

20  *Graham*, 490 U.S. at 396 (citations omitted).  "Whether a particular use of force was

21  'objectively reasonable' depends on several factors, including the severity of the crime that

22  prompted the use of force, the threat posed by a suspect to the police or to others, and

23  whether the suspect was resisting arrest."  *Tatum*, 441 F.3d at 1095.

24      **B.     Discussion**

25  There is no dispute that Plaintiff was tased multiple times by Defendants Kerzaya

26  and Hanson.  Although Defendant Pfeiffer did not deploy her taser, officers can be held

27  liable for failing to intercede when their fellow officers violate constitutional rights.  *See*

28  *Cunningham v. Gate*s, 229 F.3d 1271, 1289-90 (9th Cir. 2000).  Courts have recognized

1    that being shocked with a taser is a painful experience, and there is a foreseeable risk of
2    physical injury; thus, its use constitutes "a significant intrusion on a victim's Fourth
3    Amendment right."  *Kaady v. City of Sandy*, CV 06-1269-PK, 2008 WL 5111101, at *16
4    (D.Or. Nov. 26, 2008); *see Bryan v. MacPherson*, 630 F.3d 805, 824-26 (9th Cir. 2010)
5    ("[t]he pain, and foreseeable risk of physical injury lead us to conclude that [Tasers]
6    constitute an intermediate or medium, though not insignificant, quantum of force")
7    (citations and internal quotations omitted).  Accordingly, based on the undisputed facts and
8    existing case law, Defendants' use of a taser amounted to "an intermediate, significant level
9    of force that must be justified by the governmental interest involved . . . ."  *Bryan*, 630 F.3d
10   at 810; *Bustamante v. Gonzalez*, CV 07-0940 PHX-DGC, 2010 WL 396361, at *6 (D. Ariz.
11   Jan. 29, 2010).

12       The Court must evaluate the *Graham* factors to determine the importance of the
13   government interest at stake during Plaintiff's arrest.  The first factor examines the severity
14   of the crime at issue.  *Espinosa*, 598 F.3d at 537.  There is no dispute that Plaintiff was
15   identified as the perpetrator in an assault.  Although the crime was only charged as a
16   misdemeanor, the crime at issue was nonetheless a serious offense characterized by
17   violence, thereby supporting that the force used was reasonable.  *Deorle v. Rutherford*, 272
18   F.3d 1272, 1280 (9th Cir. 2001) ("character of the offense is often an important
19   consideration in determining whether the use of force was justified" ).

20       Next, the Court examines the "most important *Graham* factor"; whether Torres
21   "posed an immediate threat to the safety of the officers or others."  *Mattos v. Agarano*, 661
22   F.3d 433, 441 (9th Cir. 2011).  "A simple statement by an officer that he fears for his safety
23   or the safety of others is not enough; there must be objective factors to justify such a
24   concern."  *Bryan*, 630 F.3d at 826 (citation and quotation omitted).  It is undisputed that
25   the individual Defendants were aware of Plaintiff's suspected assault, Plaintiff's children
26   were still in the apartment with him, Plaintiff did not put his toddler son down despite being
27   ordered to do so several times by the officers, that Plaintiff shouted profanities and verbally
28   threatened the officers while holding his toddler son, and Plaintiff did not roll over onto his

stomach after the initial tasing.  Plaintiff explains that he was unable to immediately roll over because he was still stunned from being tased, but in the heat of the moment, it was not unreasonable for Defendants to interpret Plaintiff's failure to roll over as resistance. Moreover, even though Plaintiff was not armed at the time, and Ms. Brand had reported that there were no weapons in the apartment, without having had a chance to pat Plaintiff down for weapons, Defendants had no way of knowing whether Plaintiff had gained access to any harmful objects in the time between Ms. Brand leaving the apartment and the officers' arrival.  On this record, Plaintiff's failure to comply with police commands, his aggressive behavior, Defendants' knowledge of Plaintiff's suspected crime and uncertainty as to whether Torres had any harmful objects in his possession, all support that Defendants' use of force was reasonable.

The last factor the Court considers is whether Plaintiff was resisting arrest or attempting to escape.  *Espinosa*, 598 F.3d at 537.  Again, based on the undisputed facts, it was reasonable for the individual Defendants to interpret Plaintiff's aggressive behavior and his failure to put his son down as resistance.

Based on the foregoing, the *Graham* factors support the conclusion that the government's interest in using force was substantial.  *See Graham*, 490 U.S. at 396.

Finally, the Court must balance the force used against the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)). This determination is judged from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396-97.  Summary judgment is appropriate if, after resolving all factual disputes in the plaintiff's favor, the Court concludes that the officers' use of force was objectively reasonable.  *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Plaintiff contends that the crime he was being arrested for was not serious, he posed no threat to arresting officers or others, and that he was not actively resisting arrest, but Plaintiff's interpretation is in clear contradiction to the body cam footage which shows him holding his one-year-old son while shouting profanities and verbally threatening the

officers and resisting officers' attempts to grab his arm.  It is apparent from the various videos that Plaintiff failed to comply with Defendants' commands, repeated well over a dozen times, to release his child.  Plaintiff's act of noncompliance here, which could reasonably be viewed as using the one-year-old child to prevent arrest, is on its own sufficient to justify Defendants' use of a taser, given that Plaintiff's actions also created a substantial risk of injury to the child.

Plaintiff also argues that Defendants ignored the risk to Plaintiff's one-year-old son when they chose to tase Plaintiff while he was still holding the child.  But the video footage clearly shows that Plaintiff was given several chances to put the child down or hand the child to one of the officers, and he chose not to do so.  The video footage also shows that the officers tased Plaintiff when he was standing next to a pile of cardboard boxes and garbage bags filled with clothes, and Plaintiff and his son had a soft landing after Plaintiff was tased.  Plaintiff had multiple opportunities to surrender prior to Defendants' use of force, yet he failed to do so.  Plaintiff's own actions extended and escalated the situation, thereby leading to Defendants' use of force.

Plaintiff asserts that the officers outnumbered him 5-to-1 and "could have conducted their investigation outside, left [Plaintiff] with the two female officers as requested, and/or allowed the situation to deescalate."  (Doc. 94 at 26.)  But the Ninth Circuit has held, that even though police officers might have "less intrusive alternatives available to them," they "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."  *Scott*, 39 F.3d at 915.  Given the undisputed facts presented here and Defendants' inability to determine whether Plaintiff was armed or whether he would hurt the child he was holding, it is not readily apparent that other options were reasonably available at the moment that Plaintiff picked up his toddler son and began yelling at and verbally threatening Defendants or when he was on the ground and failing to roll over so he could be handcuffed.  *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("[i]f the person is armed—or

reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat").

Plaintiff also objects to the multiple and simultaneous tasings he endured.  But as discussed, Plaintiff's aggressive behavior, noncompliance, and failure to release his child justified the officers' initial tasings.  Moreover, Defendants' subsequent tasings, while they tried to handcuff Plaintiff, were justified given clear evidence showing that Plaintiff was still moving around on the floor after the initial tasings and would not roll over onto his stomach so that he could be handcuffed.  As mentioned, even assuming Plaintiff was too stunned to roll over, in the quickly evolving situation, it was not unreasonable for the officers to interpret this as resistance.

In sum, when taking Plaintiff's facts as true and assessing the totality of the circumstances confronting Defendants, the Court finds that Defendants Kerzaya and Hanson's use of their tasers was objectively reasonable under the circumstances.  The record reflects that these Defendants used the amount of force reasonably believed necessary to prevent harm to others and detain Plaintiff.  Because the record does not support a constitutional violation by Defendants Kerzaya and Hanson, Defendant Pfeifer cannot be liable for failing to intercede.  The Court will therefore grant summary judgment to Defendants Kerzaya, Hanson, and Pfeiffer, and the parties' qualified immunity arguments need not be further addressed.

**VI.    Municipal Liability**

A municipality may not be sued solely because an injury was inflicted by its employees or agents.  *Monell*, 436 U.S. at 691–92; *Long v. Cnty. of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006).  The actions of individuals may support municipal liability only if the employees were acting pursuant to an official policy or custom of the municipality.  *Botello v. Gammick*, 413 F.3d 971, 978-79 (9th Cir. 2005).  A § 1983 claim against a municipal defendant "cannot succeed as a matter of law" unless a plaintiff alleges facts showing: (1) a constitutional deprivation; (2) that the municipal defendant had a policy or custom; (3) that the policy or custom amounted to deliberate indifference to the plaintiff's

constitutional right; and (4) that the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001). Thus, the critical question in the *Monell* analysis is whether the entity's policy or custom inflicted the harm or injury, or if the harm resulted from the independent acts of a subordinate. *See Humphries*, 562 U.S. at 36.

Because the Court has determined that no constitutional violation occurred, Plaintiff's municipal liability claim fails on the first *Monell* element and will be dismissed.

## VII.   State Law Claims

### A.   Assault and Battery

Because Arizona law provides that a person cannot be civilly liable for justified conduct, A.R.S. § 13–413, Defendants are not liable for assault or battery if they were justified in using force to effect Plaintiff's arrest. An officer is justified in using physical force to make an arrest if: (1) a reasonable person would believe "such force is immediately necessary to effect the arrest;" (2) "[s]uch person makes known the purpose of the arrest ... or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detailed;" and (3) "[a] reasonable person would believe the arrest or detention to be lawful." A.R.S. § 13–409.

As the Court concluded in its excessive force analysis, Defendants' use of force was objectively reasonable. The justification statute requires that a "reasonable person would believe" the force was necessary. A.R.S. § 13–409. Because Defendants were justified under Arizona law in their use of force, Plaintiff's assault and battery claim will be dismissed.

### B.   Gross Negligence

Similarly, Plaintiff's gross negligence claim also fails. To support a state law gross negligence claim, a plaintiff must show that a defendant acted or failed to act when he knew or had reason to know facts that "would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Ariz. Dep't of Pub. Safety*, 826

P.2d 1217, 1221 (Ariz. Ct. App. 1991) (citation omitted).  As discussed, Defendants' use of force was reasonable and did not amount to gross negligence where the unrefuted record shows that Plaintiff repeatedly failed to comply with the officers' commands and threatened them while holding his infant son.  Because Defendants' use of force was objectively reasonable, they did not act negligently toward Plaintiff.

### C.   IIED

To prove a claim for intentional infliction of emotional distress, a plaintiff must show sufficient facts that: (1) the conduct by the defendant is "extreme" and "outrageous"; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from his conduct; and (3) severe emotional distress occurred as a result of defendant's conduct. *Citizen Publishing Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005) (citing *Ford v. Revlon, Inc*., 734 P.2d 580, 585 (Ariz. 1987)). A plaintiff must show "the defendant's conduct 'was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Johnson v. McDonald*, 3 P.3d 1075, 1080-81 (Ariz. App. 1999) (quoting *Cluff v. Farmers Ins. Exchange*, 460 P.2d 666, 668 (Ariz. 1969) (quoting Restatement (Second) of Torts § 46 cmt.d)).  The conduct must fall "[a]t the very extreme edge of the spectrum of possible conduct." *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (1980).  Whether a defendant's conduct may be regarded as extreme and outrageous is initially examined by the court as a matter of law. Restatement (Second) of Torts § 46 (1965).  Again, the undisputed facts show that Defendants' conduct was reasonable under the circumstances and did not rise to the level of outrageous or extreme to support an IIED claim.

Because Plaintiff's claims against the individual Defendants have failed, Plaintiff's state law claims against the City also fail.  For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted, and the action will be dismissed without prejudice.[3]

---

[3] To the extent Plaintiff brings any of the § 1983 or state law claims on behalf of his

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 71) and Motion in Limine re: Exclude Expert Testimony (Doc. 115).

(2)     Defendants' Motion for Summary Judgment (Doc. 71) is **granted**.

(3)     Defendants' Motion in Limine re: Exclude Expert Testimony (Doc. 115) is **denied as moot**.

(4)     The Clerk of Court must terminate the action and enter judgment accordingly.

Dated this 21st day of September, 2022.

James A. Teilborg
Senior United States District Judge

---

children, the Court will also grant summary judgment to Defendants as to these claims. The undisputed evidence shows that none of the taser probes touched Plaintiff's one-year-old son. Moreover, the evidence shows that when Plaintiff fell, the child had a soft landing and was not harmed during the fall. Again, the Court notes that Plaintiff had several opportunities to put the child down and refused to do so. Plaintiff has not presented any evidence to refute this or to show that an unreasonable amount of force was used against the child he was holding. Likewise, based on the Court's finding that Defendants' conduct was reasonable under the circumstances, dismissal of all claims is appropriate to the extent the children are named as additional Plaintiffs.